**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

No. 19-3900

————————

NICHOLAS KUHAR; JULIE KUHAR,
                                          Appellants
v.

PETZL COMPANY d/b/a Petzl; PETZL AMERICA, INC d/b/a Petzl;
BAILEY'S CORPORATION; UNLIMITED XYZ CORPORATIONS (fictitious entities);
UNLIMTED JOHN DOES (fictitious entities; UINTAH FASTENER & SUPPLY;
THOMPSON MANUFACTURING; PORTEOUS FASTENER COMPANY;
BRIGHTON–BEST; QUALITY PLATING

————————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 1-16-cv-00395)
District Court Judge: Honorable Renee M. Bumb

————————

Submitted Pursuant to L.A.R. 34.1(a) on
October 25, 2021

Before: GREENAWAY, JR., PHIPPS, and COWEN, *Circuit Judges*

(Opinion filed: April 13, 2022)

————————

OPINION[*]

————————

GREENAWAY, JR., *Circuit Judge*

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

## I. INTRODUCTION

This appeal presents the question of whether, under the New Jersey Product Liability Act ("NJPLA"), a plaintiff must produce expert testimony to support a product defect case. Plaintiffs Nicholas Kuhar and Julie Kuhar (collectively, "Plaintiffs") filed suit against Defendant–companies alleging that a defective bolt broke while using a device incorporating the bolt.[1] The Magistrate Judge determined that Plaintiffs' expert failed to meet the requirements of *Daubert* and struck the report. The District Judge later affirmed this ruling before also adopting the Magistrate Judge's Report and Recommendations granting summary judgment. We agree and will affirm the District Court's grant of summary judgment.

## II. BACKGROUND

Plaintiff Nicholas Kuhar ("Kuhar") fell from a thirty-seven-foot-high barn onto crushed concrete in December 2013. **Appx. I, 53–54;** *see also* **District Court ECF No. 102 (Second Amended Complaint) at 6.** He was severely injured. **Appx. I, 53.** While working on the barn, Kuhar had been using a safety harness that he had purchased as part

---

[1] Plaintiffs in this case are husband and wife. The Second Amended Complaint lists three causes of action: strict liability, breach of warranty, and loss of consortium. **District Court ECF No. 102 at 6-7.** Only the loss of consortium cause of action individually identifies the relevant plaintiff, Julie Kuhar. *Id.* Because Plaintiff Nicholas Kuhar was the only plaintiff who used and was allegedly injured by the product, he is the relevant plaintiff for the strict liability and breach of warranty causes of action. *See Myrlak v. Port Auth. of New York and New Jersey*, 723 A.2d 45, 56 (N.J. 1999) (citations omitted) (explaining the requirement that, *inter alia*, the alleged defect have "proximately caused injuries to the plaintiff"). Unless otherwise noted in the text, "Plaintiffs" in this opinion refers to both Nicholas Kuhar (the device user) and Julie Kuhar (who holds the derivative claim).

of a "flip-line kit" seven years earlier. **Appx. I, 53–54.** The "flip-line kit" contained a carabiner, a rope, and a micrograb. Plaintiffs allege that this micrograb contained a defective bolt. *Id*. **at 53.** Between the purchase of the product in 2006 and the accident in 2013, Kuhar had used the device four to five times per month, and admitted to having disassembled and reassembled the device. **Appx. I, 56, 68; Supplemental Appendix ("S.A.") I, Kuhar Dep. 191:4–20.** Kuhar was wearing the rope wrapped around a safety line and attached to the micrograb when he alleges that "'the bolt attached to the carabiner of the safety harness snapped.'" App. I, 39. His son found the bolt outside near the barn three months after the accident. **S.A. at 234:10–235:12, 237:12–22.**

Plaintiffs initially filed suit in New Jersey Superior Court. **Appx. I, 10–11;** *see also* **Appellant's Br. at 3 and District Court ECF No. 1.** Defendant-Petzl America, Inc. timely removed the action to the U.S. District Court for the District of New Jersey.[2] **Appx. I, 10–11.** Their amended complaint asserted state-law claims under strict liability, breach of warranty, and loss of consortium.[3] **District Court ECF No. 102 at 6–7.** After

---

[2] Plaintiffs initially filed this lawsuit against Petzl Company, d/b/a Petzl America, Inc. d/b/a/ Petzl, and Bailey's Corp., et al. **District Court ECF No. 1-1 (Exhibits to Notice of Removal).** Plaintiffs subsequently amended their complaint to add defendants Thompson Manufacturing, Inc., Uintah, as well as fictitious corporations, and John Does. **Appx. I, 53–54;** *see also* **District Court ECF Nos. 43 and 44.** Uintah later impleaded Porteous Fastener & Supply, LLC, Brighton-Best, Inc., and Quality Plating. **Appx. I, 54-55;** *see also* **District Court ECF Nos. 83.**

[3] By the point of summary judgment, Plaintiffs pursued only a design defect claim against only Porteous Fastener & Supply, LLC, Brighton-Best, Inc., Uintah, and Petzl Company, **Appx. I, 56,** and a failure to warn claim against only Petzl Company. *Id*. **at 56–57.** They had dropped their breach of warranty claim against all defendants. *Id*. **at 56–57.**

the parties exchanged expert witness reports during discovery, Defendants Uintah and Bailey's Corporation filed motions to strike Plaintiffs' expert for reportedly failing to satisfy requirements under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). **Appx. I, 10-34;** *see also* **District Court ECF Nos. 185, 196-3, 257, 338**. The Magistrate Judge concluded that Plaintiffs' expert report did not meet admissibility standards and granted Defendants' *Daubert* motions to strike. **Appx. I, 10–34.** The District Court affirmed the order. *Id*. **at 35–36**.

Following the close of discovery, Defendants moved for summary judgment.[4] **Appx. I, 37–51, 52–76.** Defendants contended that without an expert witness, all of Plaintiffs' products liability claims must fail as a matter of law. **Appx. I, 57.** Specifically, Defendants asserted that: (1) Plaintiffs' design defect claims must be accompanied by expert testimony, and (2) in this situation, Plaintiffs could not rely on the indeterminate

---

[4] Defendant Quality Plating moved for summary judgment on grounds distinct from Defendants Brighton Best, Porteous Fastener, Uintah Fastener & Supply, Petzl Corporation, Petzl America, and Bailey's Corporation. **District Court ECF No. 183 (Def. Quality Mot. for Summary Judgment); District ECF No. 326-19, 327, 328, 329, 336 (All Other Def. Mot. for Summary Judgment);** *see also* **Appx. I, 42 (discussing Quality Plating seeking summary judgment because it was not a manufacturer, seller, or distributor, in addition to a lack of expert testimony) and Appx. I, 57 (discussing the grounds above filed in motions for summary judgment from the remaining defendants).** Nevertheless, on appeal in this Court, Quality Plating adopted the opposition briefs of all other Appellees and did not submit its own brief. **ECF. No. 76 (Letter from Quality Plating).** The briefs of all other Appellees do not address the separate and distinct grounds for which the District Court granted summary judgment to Quality Plating. **District Court ECF No. 337 at 11 n.4; Appx. I, 47.** As will be discussed, at least one ground for which the District Court granted summary judgment— the lack of an expert witness—applies to all Appellees. Therefore, although in substance this opinion will discuss the relevant parts of the Brighton Best, Porteous Fastener, Uintah Fastener & Supply, Petzl Corporation, Petzl America, and Bailey's Corporation filings, the analysis applies to all Defendants, including Quality Plating.

product defect test. *Id.* The Magistrate Judge and District Court agreed with Defendants. **Appx. I, 37, 51; 52–53; 75–76; 77–78; 79–85.** The District Court granted summary judgment. **Appx. I, 77–85.** This appeal followed. **Appx. I, 88;** *see also* **District Court ECF. No. 354.**

## III.  JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over this case pursuant to 28 U.S.C. § 1332. We have jurisdiction pursuant to 28 U.S.C. § 1291.

We exercise plenary review over a grant of summary judgment, and we apply the same legal standards as the District Court. *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019). A court may grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material for Rule 56 purposes if its "existence or nonexistence might impact the outcome of the suit" under the governing law. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). We "'may affirm the District Court['s order granting summary judgment] on any grounds supported by the record.'" *Kossler v. Crisanti*, 564 F.3d 181, 186 (3d Cir. 2009) (quoting *Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir. 2000)).

We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997); *see also Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). A district court abuses its discretion to admit or exclude expert testimony "only when the decision 'rests upon a clearly erroneous finding of fact, an errant conclusion of law[,] or an

5

improper application of law to fact.'" *Schneider*, 320 F.3d at 404 (quoting *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000)).

## IV.   DISCUSSION

On appeal, although Plaintiffs raise several issues, the presence or absence of an expert witness effectively narrows the issues we must resolve to two.[5]  First, whether Plaintiffs' various products liability claims require expert testimony.  Second, whether the District Court abused its discretion when it excluded Plaintiffs' expert witness.[6]

### a.  Plaintiffs' Product Defect Theories Require Expert Testimony.

Plaintiffs asserted three theories of liability under the NJPLA—design defect, indeterminate product defect, and failure to warn.  Under the facts presented, each of these theories requires expert testimony under New Jersey law.

### i.  Design Defect

In relevant part, the NJPLA provides that a product's design can give rise to liability for "[a] manufacturer or seller of a product . . . [if,] by a preponderance of the evidence . . . the product causing the harm . . . was designed in a defective manner."  N.J.

---

[5] Plaintiffs raise five issues covering: (1) the appropriateness of excluding their expert, (2) whether *res ipsa loquitor* could apply to the broken bolt, (3) whether Defendants are sellers, (4) whether the bolt is a complex instrumentality, and (5) whether the District Court should have allowed them to pursue their failure to warn claim. **Appellant's Br. at 1–2.**

[6] Because we dispose of the appeal based on the lack of expert testimony, we need not address whether Defendants are sellers and therefore strictly liable under New Jersey law. *See Hector v. Watt*, 235 F.3d 154, 161 (3d Cir. 2000) (explaining that because "we have other, sufficient grounds for resolving this case, we will not reach" a particular issue also on appeal).

6

Stat. Ann. 2A:58C–2.  Proving a defect first entails establishing that the product was defective (i.e., that a product was "not reasonably fit, suitable, or safe for the ordinary or foreseeable purpose for which it [was] sold.").  *Myrlak v. Port Authority of N.Y and N. J.*, 723 A.2d 45, 52 (N.J. 1999) (citing *Waterson v. Gen. Motors Co.*, 544 A.2d 357, 372 (N.J. 1988)); *see also* N.J. Stat. Ann. 2A:58C–2.  Next, a plaintiff must show that the defect existed when it left the control of the manufacturer; proximately caused the harm alleged; and that the plaintiff was an intended or reasonably foreseeable user.  *Lauder v. Teaneck Vol. Ambulance Corps*, 845 A.2d 1271, 1277 (N.J. Super. Ct. App. Div. 2004).

To overcome the first hurdle, New Jersey law allows a party to employ direct or circumstantial evidence.  *Scanlon v. Gen. Motors Corp., Chevrolet Motor Div.*, 326 A.2d 673, 677–78 (N.J. 1974).  A party using direct evidence may rely on expert testimony. *Id*. at 678.  Circumstantial evidence, by contrast, can be acceptable when a plaintiff shows that an accident occurred plus "proof of proper use, handling[,] or operation of the product[,] and the nature of the malfunction . . . ."  *Id*. at 677.  Ordinarily, when a plaintiff chooses to use circumstantial evidence "proof of proper use, handling or operation of the product[,] and the nature of the malfunction, may be enough to satisfy the requirement that something is wrong with [the product]."  *Id*.  But, where a factfinder must employ "scientific, technical, or other specialized knowledge" use of expert testimony is required.  *Jerista v. Murray*, 883 A.2d 350, 364 (N.J. 2005).

Here, Plaintiffs initially secured the assistance of a metallurgical and material sciences expert.  **Appx. I, 10–34;** *see also* **Appx. II, 155–63.**  This expert produced a report that concluded, in part, that the bolt in question contained two design defects and

7

one manufacturing defect. **Appx. I, 13;** *see also* **Appx. II, 162.** Defendants moved to strike Plaintiffs' expert report, because it failed to satisfy Federal Rule of Evidence 702 and *Daubert.* **Appx. I, at 14;** *see generally id*. **at 10–34.** The Magistrate Judge granted the motion, **Appx. I, 10–34,** and the District Judge affirmed the ruling, **Appx. I, 35–36**. When Defendants later sought summary judgment, the Magistrate Judge found that the bolt in question was a "complex instrumentality," which required Plaintiffs "to provide expert testimony to assist the trier of fact." App. I, 61; *see generally id.*, 61–67. Because the District Court had previously stricken Plaintiffs' expert report, the Magistrate Judge concluded that Plaintiffs, without the expert report, could not establish that the bolt was defective. *See generally* **Appx. I, 52–76.** The District Court affirmed. *Id*. **at 77–85.**

On appeal, Plaintiffs argue that the decision below erroneously classified the bolt as a complex instrumentality that would require the use of expert testimony. **Appellant's Br. at 21–24.** Plaintiffs appeal only the determination that the bolt was a complex instrumentality. *Id*. They do not contest that "where the allegedly defective product involves a complex instrumentality, a plaintiff is required to provide expert testimony to assist the trier of fact."[7] App. I, 61. However, this statement of the law—what New Jersey law requires in complex instrumentality cases—is where we should start.

---

[7] Because Plaintiffs do not challenge the statement that "where the allegedly defective product involves a complex instrumentality, a plaintiff is required to provide expert testimony to assist the trier of fact . . .," App. I, 61, they apparently concede this statement of law. *See also* App. I, 42 ("[P]laintiff's counsel agreed with the Court's statement that, 'without an expert, [he] can't pursue that theory.'" (second alteration in original)).

The Supreme Court of New Jersey has spoken definitively regarding the issue at hand. In *Jerista v. Murray*, the state's highest court explicitly overruled an earlier Appellate Division ruling that improperly read prior state supreme court decisions as: (1) requiring expert testimony in cases involving complex instrumentalities, and (2) making *res ipsa loquitor* unavailable without such testimony. 883 A.2d 350, 363–64 (N.J. 2005) (overruling *Jimenez v. GNOC, Corp.*, 670 A.2d 24 (N.J. Super. Ct. App. Div. 1996)). Instead, the Supreme Court of New Jersey explained that "[t]he question is not whether the instrumentality at issue is complex or simple, but whether based on common knowledge the balance of probabilities favors negligence, thus rendering fair the drawing of a *res ipsa* inference." *Id.* at 364 (citing *Buckelew v. Grossbard*, 435 A.2d 1150, 1157–59 (N.J. 1981)). In other words, the Supreme Court of New Jersey has "reject[ed] any reading of [its precedent] that imposes a categorical expert testimony requirement when a complex instrumentality within the exclusive control of the defendant causes an injury." *Id.*

On the other hand, the Supreme Court of New Jersey has specified a circumstance that does require expert testimony: "Only when the *res ipsa* inference falls outside of the common knowledge of the factfinder and depends on scientific, technical, or other specialized knowledge is expert testimony required." *Id.* at 364 (citing *Buckelew*, 435 A.2d 1157–59). Plaintiffs here contend that the bolt in question "is simple, not complex," because a juror can "understand the function of a bolt, or whether a bolt is supposed to break." Appellant's Br. at 24. This contention, though, ignores important wrinkles that the underlying facts add to the inquiry.

How a court is to determine what a factfinder can understand without the assistance of expert testimony is based on what falls "within the common knowledge of the average juror." *United States v. Davis*, 397 F.3d 173, 179 (3d Cir. 2005); *see also McDaid v. Aztec W. Condo. Ass'n.*, 189 A.3d 321, 331 (N.J. 2018) (citing *Jerista*, 883 A.2d at 364–65) (stating likewise that what a factfinder can be expected to understand without expert testimony that which is "common knowledge of judges and jurors"). Despite Plaintiffs arguing that the alleged defect involved a simple bolt, the bolt was a component part of the micrograb. The average juror, even assuming some familiarity with micrograbs, is unlikely to understand, among other things, the engineering design considerations; metallurgical aspects of plating the bolt; or the principles of physics at work on the bolt when in use. Thus, understanding the functions of the bolt and micrograb—both in general and surrounding the incident—"fall[] outside of the common knowledge of [a] factfinder," and would necessitate "depend[ence] on scientific, technical, or other specialized knowledge." *Jerista*, 883 A.2d at 364.

Accordingly, the District Court properly concluded that expert testimony was required.

### ii. Indeterminate Product Defect

In support of their design defect claims, Plaintiffs next contend that the indeterminate product defect test—a *res ipsa loquitor*–type inference—permits the case

to continue without the use of an expert.[8]  Here, the nature of the micrograb at issue and the underlying facts also bar the application of this alternative test.

Although a traditional *res ipsa loquitor* jury charge cannot be used in a strict products liability case, the Supreme Court of New Jersey has made available an indeterminate product defect test in its stead.  *Myrlak*, 723 A.2d at 48.  The indeterminate product defect test "is limited to those product liability cases in which the plaintiff cannot prove a specific defect."  *Id*. at 56.  Under this test, adopted from the Restatement (Third) of Torts:

> It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff:
>
> (a) was of a kind that ordinarily occurs as a result of a product defect; and
> (b) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution.

*Id*. at 55 (quoting Restatement (Third) of Torts § 3 (Am. L. Inst. 1998)).  Generally, when a plaintiff relies on such a test, the use of expert testimony is not required.  *Jerista*, 883

---

[8] Traditional *res ipsa loquitor* requires there to be: (1) an accident that would not ordinarily occur without negligence, (2) the instrumentality causing the harm to have been in the exclusive control of the defendant, and (3) the injured person to have not caused any part of the accident.  *Tormenia v. First Invs. Realty Co.*, 251 F.3d 128, 136 (3d Cir. 2000) (quoting *Eaton v. Eaton*, 575 A.2d 858, 863 (N.J. 1990)).  New Jersey's indeterminate product defect test resembles *res ipsa loquitor*.  The test allows for the inference of liability to be drawn when, among other requirements, the type of harm suffered would ordinarily occur as a result of a product defect, and the alleged defect could have been the only cause of the harm.  *Myrlak*, 723 A.2d at 56 (citing Jonathan M. Hoffman, *Res Ipsa Loquitur and Indeterminate Product Defects: If They Speak for Themselves, What Are They Saying?*, 36 S. TEX. L. REV., 353, 356 (1995)).

A.2d at 364. But, "when the *res ipsa* inference falls outside of the common knowledge of the factfinder and depends on scientific, technical, or other specialized knowledge . . . expert testimony [is] required." *Id.*

For the same reasons that Plaintiffs' design defect theory fails, their indeterminate product defect theory also fails. Because of the particular facts in this situation, the knowledge needed to understand the function of the bolt and micrograb falls outside of a factfinder's common knowledge. Thus, the necessary understanding would require "depend[ence] on scientific, technical, or other specialized knowledge" (i.e., expert testimony) to determine whether the device was defective and caused the harm alleged. *Id.* at 364.

The District Court likewise did not err when it granted summary judgment for lack of an expert witness as to this theory.

### iii. Failure to Warn

In briefs in opposition to the motions for summary judgment, Plaintiffs raised for the first time a failure to warn claim. **Appx. I, 68;** *see also* **District Court ECF No. 209 at 5, District Court ECF. No. 331 at 5.** They asserted that misuse of the device was foreseeable. *See generally* **District Court ECF No. 331.** Further, because Defendants failed to warn of the dangers of disassembling the device and provided an Allen wrench with the flip-line kit, Plaintiff Kuhar disassembled the micrograb and incorrectly reassembled it. **Appx. I, 68;** *see also* **District Court ECF No. 331 at 4-5.** Consequently, doing so subjected the bolt to large amounts of stress where it was not

12

intended to sustain such stress. **Appx. I, 68;** *see also* **District Court ECF No. 331 at 4-5.**

As a threshold matter, Plaintiffs forfeited their failure to warn argument. *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 146–47 (3d Cir. 2017) (citations omitted). The Magistrate Judge's Report and Recommendation noted that Plaintiffs conceded that they raised the failure to warn argument for the first time in their brief in opposition to the motion for summary judgment. **Appx. I, 57, 69.** On appeal, Plaintiffs argue that the District Court erred when it failed to consider this claim because of its late entry. **Appellant's Br. at 24-25.** There is no error. *Garza v. Citigroup, Inc.*, 881 F.3d 277, 284–85 (3d Cir. 2018) (quoting *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993)) ("'[W]here an issue is raised for the first time in a reply brief, we deem it insufficiently preserved for review before this [C]ourt." (first alteration in original)). Because Plaintiffs raised it solely in their brief in opposition, they "[f]ail[ed] to make the timely assertion of a right." *Barna*, 877 F.3d at 147 (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). Therefore, the District Court did not err when it declined to consider the failure to warn argument.

### b. The District Court Did Not Abuse Its Discretion When It Excluded Plaintiffs' Expert.

Plaintiffs retained an expert to "determine the probable cause of the [alleged] failure of the bolt in the micrograb device." App. II, 156. Plaintiffs' expert produced a report, but Defendants successfully challenged this report based on its lack of reliability

13

and fit. **Appx. I, 17;** *see generally id*. **at 10–34.** We now review the critical decision to strike Plaintiffs' expert report.

A trial court's decision to admit or exclude evidence is a matter of discretion; review of the decision is "narrow" and we will deem a decision to be an abuse of discretion "only when the decision rests upon a clearly erroneous finding of fact, an errant conclusion of law[,] or an improper application of law to fact." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 831 (3d Cir. 2020) (quoting *Schneider*, 320 F.3d at 404). Here, Defendants moved to strike Plaintiffs' expert report based on Federal Rule of Evidence 702 and *Daubert*, which impose "gatekeeping obligation[s]" on trial courts. **Appx. I, 14;** *UGI Sunbury*, 949 F.3d at 832.

Under Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

We have described Rule 702 as a "'trilogy of restrictions on expert testimony: qualification, reliability[,] and fit.'" *Calhoun v. Yamaha Motor Corp., USA*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *Schneider*, 320 F.3d at 404). Because Defendants challenged Plaintiffs' expert report based on reliability and fit, we turn our analysis to these requirements.

14

### i. Reliability

Under *Daubert*, reliability compels "the expert's opinion . . . [to] be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; [sic] the expert must have 'good grounds' for his or her belief." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (quoting *Daubert*, 509 U.S. at 590). Reliability also ensures that there is a sufficient connection between "'conclusions and methodology.'" *Oddi*, 234 F.3d at 146 (quoting *Joiner*, 522 U.S. at 146). To that end, the standard prohibits "'too great a gap between the data and the opinion proffered.'" *Id.* (quoting *Joiner*, 522 U.S. at 146).

Courts, nonetheless, do not look for whether "'a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research.'" *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 81 (3d Cir. 2017) (quoting *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000)). Instead, courts "look[] to whether the expert's testimony is supported by 'good grounds.'" *Id.* (quoting *In re TMI Litig.*, 193 F.3d at 665). We have clarified that "good grounds" may include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*UGI Sunbury*, 949 F.3d at 834 (citations omitted).

15

Here, The Magistrate Judge identified ten opinions expressed by Plaintiffs'

expert.[9] **Appx. I, 13–14**. The Magistrate Judge determined that these opinions were

either net opinions or otherwise unreliable, and provided detailed explanations for each of

these findings. *Id*. **at 10–34.**

The "net opinion rule" prohibits expert testimony "if the court concludes that an

opinion based upon particular facts cannot be grounded upon those facts . . . [or] is based

on speculation or conjecture." *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 75

(3d Cir. 1996). The Magistrate Judge determined that opinions 1, 3, 5, and 7 were

---

[9] The District Court later affirmed the Magistrate Judge's order striking Plaintiffs' expert. **Appx. I, 35–36;** *see also* **District Court ECF No. 322.** For purposes of this section, we will refer to only the Magistrate Judge's decision, although technically our review is of the District Court's order. The opinions listed in the report and identified by the Magistrate Judge were:

1. The bolt failed by high cycle low stress fatigue failure, followed by final overload failure.
2. The failure location was at a notch in the bolt shank profile created by a sharp reduction in the bolt diameter.
3. The sharp profile change at the failure initiation site was a design defect.
4. Sharp threads on the bolt at the crack initiation site were a design defect.
5. Machining grooves on the bolt further concentrating the stress at the failure initiation site.
6. Machining grooves were a manufacturing defect.
7. The bolt would not have failed on December 24, 2013 if the design and/or manufacturing defects were not present.
8. Bailey's choose [sic] an improper rope to include in the micrograb kit.
9. I hold the above opinions to a reliable degree of metallurgical and engineering certainty.
10. I reserve the right to modify, change or supplement my opinions if additional information becomes available to me.

App. I, 13–14.

impermissible "net opinion[s]" and provided reasoning to support these conclusions. **Appx. I, 19, 22, 27, 28, and 30.** For instance, the Magistrate Judge explained that opinions 1 and 5 were impermissible net opinions about the stress on the bolt, because there were "no quantitative data or quantifiable testing results to support the [opinions]." App. I, 19. This conclusion is well grounded. As the Magistrate Judge explained, Plaintiffs' expert report stated that "low stress fatigue failure" and "final overload fracture" caused the bolt to break. App. I, 20. But the report failed to define those terms or provide quantitative analysis elucidating how the expert reached these conclusions. App. I, 20–21. Similarly, for opinion 3, the expert's opinion "omit[ted] the 'why and wherefore,'" App. I, 22, and contained "an inherent conflict between [the expert]'s examination of the bolt and his ultimate conclusions relating to design defects," *id*. at 25.

Therefore, because the report lacked coherent detail about how the expert arrived at his opinions, it was not error to conclude that opinions such as these were impermissible "net opinions."[10]

The Magistrate Judge also had reason to conclude that opinions 2, 3, 4, 6, and 8 were "not reliable."[11] **Appx. I, 21, 22, 28–29, and 30–31.** For instance, the Magistrate

---

[10] The Magistrate Judge held that opinion 7 was an improper net opinion because it "incorporate[d] by reference the previously stricken opinions." App. I, 30.

[11] The Magistrate Judge noted that opinions 9 and 10 were not relevant to the *Daubert* analysis. **Appx. I, 33.** Opinions 9 and 10, as republished in footnote 9, *supra*, state only that the expert believed opinions 1-8 were reliable to a "reasonable degree of metallurgical and engineering certainty," and that he "reserved the right to modify, change or supplement [his] opinions if additional information becomes available to [him]." App. I, 13-14. We agree that these statements have no bearing on the analysis,

Judge explained that although in opinion 2 the expert concluded that "the failure location was at a notch in the bold shank created by a sharp reduction in the bolt diameter," his opinion similarly failed to define key terms (i.e., "'notch,'" "'shank,'" and "what constitutes a 'sharp reduction.'"). App. I, 21–22. Further, when comparing the bolt from the allegedly defective device to an exemplar bolt, the expert did not measure the location of the fracture on the subject bolt. **Appx. I, 22.** Instead, he simply stated that the subject bolt "'appears to have a similar reduced cross section at this location.'" App. I, 22. For this and other opinions, the Magistrate Judge did not incorrectly conclude that the expert's opinions were more akin to "'subjective belief or unsupported speculation" than to determinations fully "based on the [expert's use of] 'methods and procedures of science'."[12] *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 590); *see also* App. I, 22. Finally, in large measure, the indicators we recently

---

because they do not assert a specific viewpoint as to the cause of the alleged defect. Hence, we shall not consider opinions 9 and 10 in our analysis.

[12] A summary of reasons that opinions 3, 4, 6, and 8 were unreliable include:
1. Opinion 3 – The expert did not provide a reasonable alternative design, conduct a risk-utility analysis of the bolt's design, or negate other causes of the facture. App. I, 24.
2. Opinion 4 – The expert "critique[d] the bolt's 'sharp profile change,'" but he did not measure that area. App. I, 28. He also did not explain why the "'sharp threads'" were a design defect. *Id*.
3. Opinion 6 – The expert failed to lay the proper foundation for his opinion. App. I, 29.
4. Opinion 8 – The expert provided only a "terse account of the harness'[s] assembly." App. I, 31. The expert also did not explain "what constitutes an 'improper rope,'" or "'an alternative rope.'" *Id*.

espoused in *UGI Sunbury* are not present in the expert's report.[13]  *UGI Sunbury*, 949 F.3d at 834 (citations omitted) (explaining what courts look for to support "good grounds" for a conclusion).

In sum, the report lacked evidence of the necessary "good grounds" for reaching the conclusions expressed, and it was not improper for the court to determine that the opinions were unreliable.  *Daubert*, 509 U.S. at 590 (internal quotation marks omitted).

### ii.  Fit

Next, we turn to whether Plaintiffs' expert report fit, that is, whether the expert's opinions would "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a); *see also Karlo*, 849 F.3d at 81.  This requirement "goes primarily to relevance."  *Daubert*, 509 U.S. at 591.

Manufacturing and design defect claims require showing that the allegedly defective item "deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae . . . [or] was designed in a defective manner." N.J. Stat. Ann. 2A:58C–2.  The Magistrate Judge concluded that the expert's "report and the opinions contained therein leave too large a gap between the data presented and the conclusions rendered, and consequently, it fails to satisfy <u>Daubert</u>'s . . . fit requirements."

---

[13] The expert's qualifications are generally not contested.  App. I, 14 ("For the most part, defendants do not challenge [the expert's] qualifications . . . .").  *UGI Sunbury* lists "the qualifications of the expert witness testifying based on the methodology" as a factor that courts are to consider when determining whether an expert's testimony rests on good grounds.  *UGI Sunbury*, 949 F.3d at 834 (citation omitted).  However, "no one [factor] is dispositive."  *Id*. (citations omitted).

App. I, 19.  Without coherent evidence and definitive judgments, it is difficult for us to conclude that the expert's opinions could help a trier fact "to determine a fact in issue." Fed. R. Evid. 702(a).

For instance, the expert report discusses an "apparent" "extreme deformation during final shear fracture" of the bolt (i.e., a manufacturing defect).  App. II, 159.  Yet, the report also states that grooves were "virtually identical" to an "exemplar bolt."  *Id*. Moreover, even though "these measurements are close to specification values" the expert was "unclear" about the "specified tolerance" of the bolt.  *Id*.  If, after his examinations, the expert was "unclear" about the tolerance level of the bolt, then the reported information would not "help the trier of fact to understand the evidence."  Fed. R. Evid. 702(a).

Taken together, given the gaps in the expert's report, we cannot say that the decision to exclude the report "rest[ed] upon a clearly erroneous finding of fact, an errant conclusion of law[,] or an improper application of law to fact."  *UGI Sunbury LLC*, 949 F.3d at 831.  Therefore, Plaintiffs' expert report was properly excluded.

## V.    CONCLUSION

For the foregoing reasons, we will affirm the District Court's grant of summary judgment.